# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

*Plaintiff,*

vs.

Case No. 16-10112-EFM

MICHAEL J. MITCHELL, JR.,

*Defendant.*

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Michael J. Mitchell, Jr.'s motion to suppress.  Mitchell argues that the Court must suppress all evidence, including synthetic marijuana, methamphetamine, a Glock handgun, and statements he made to police after his arrest.  He contends that the drug evidence was derived from an illegal pat-down search, and the other evidence amounts to "fruits" of that illegal search.  The Government maintains that the search was constitutional because the officer had probable cause to arrest Mitchell for reckless driving, rendering the pat-down a constitutional search incident to arrest.  In the alternative, the Government also argues that the pat-down was constitutional under *Terry v. Ohio*.[1]  While the Court agrees with Mitchell that the pat-down search was not justified under *Terry*, the Court concludes that the officer had probable cause to arrest Mitchell, and thus the search was a valid

---

[1] 392 U.S. 1 (1968).

one incident to a lawful arrest.   Accordingly, the Court denies Mitchell's motion to suppress (Doc. 15).

## I.        Factual and Procedural Background[2]

Just before midnight on July 24, 2015, Wichita Police Department Officers Matt Fisher and Jamie Thompson were on a regular patrol when they drove past a residence on Whitney Lane ("Residence 1") they believed to be a "drug house."   The officers testified that Residence 1 was associated with an African-American male named "Mike," who was believed to be selling drugs and weapons out of the house.   The officers also had information about a second drug house "Mike" was associated with, located on the 2600 block of South Jewett Street ("Residence 2").   Residence 1, on Whitney Lane, is approximately 1 block north and east from Residence 2 on Jewett Street.   To the officers' knowledge, "Mike" drove a gold or tan Chevy Tahoe.

As the officers drove past Residence 1, they noticed a Chevy Tahoe parked in front. Officer Thompson ran the tags; the vehicle came back as registered to Bradley Watts.   The vehicle was also associated with a prior police investigation involving an individual named "Michael T. Mitchell."   The police department's record system listed Michael T. Mitchell as a black male, documented gang member, who had several violent criminal acts in his past.[3]   The officers did not take immediate action, opting to continue with their patrol as normal.

---

[2] The Court takes the following facts from the evidence presented at the motion hearing and, where undisputed, from the parties' briefs.

[3] The officers did not know if "Mike" was "Michael T. Mitchell," because they had no knowledge of "Mike's" last name.   They only knew that the suspect went by "Mike."

Later that evening, the officers spotted a Chevy Tahoe turning out from the 2600 block of South Jewett Street (the same cul-de-sac where Residence 2 is located).[4]   Officer Fisher "believed it was possibly the same" Tahoe he saw earlier.  Exiting Jewett Street, the Tahoe turned right (west) onto Ross Parkway.  It traveled west on Ross Parkway for slightly more than 1 block, passing through the intersection at Ross Parkway and Fees Street, and turned north into a "driveway" located between Roosevelt Street (to the west) and Fees Street (to the east).  The "driveway" is a paved road, extending north off of Ross Parkway.  It does not have a name or a street sign, but it provides access to four residences, much like a cul-de-sac.  The Tahoe parked in front of one of those residences ("Residence 3").

The officers did not have a reason to pull the Tahoe over, so Officer Fisher parked the patrol vehicle in a parking lot located at the northwest corner of the Ross Parkway and Roosevelt Street intersection.  Officer Thompson exited the vehicle and began walking east towards the Tahoe.

As Officer Thompson approached the vehicle, she heard two males outside talking. When she heard the men talking, she stopped her approach and waited.  About 30 seconds later, she saw the Tahoe leave the driveway, turning right (westbound) on to Ross Parkway.  Officer Thompson communicated this to Officer Fisher via her radio.

When Officer Fisher received the message, he was parked in a parking lot on the north side of Ross Parkway, roughly one block west of Residence 3.  Shortly thereafter, he saw the Tahoe drive past him, continuing west on Ross Parkway.  Officer Fisher pulled out of the

---

[4] The Officers also suspected, based on prior information, that there was a drug house located on the 2600 block of South Jewett Street.  South Jewett is a cul-de-sac.  On the east end of the cul-de-sac is a group of several duplexes or quadplexes.  The Officers did not know specifically which of those units was the suspected drug house.

parking lot and began following the Tahoe, which he estimated to be traveling at "probably 30, 35 miles an hour."  The Tahoe continued west on Ross Parkway for about two blocks before turning south onto Rutan Street.  On Rutan, the Tahoe quickly "circled back" north to get back onto Ross Parkway.  Officer Fisher believed "the driver knew I was following it so it was just going to attempt to get back to where it was."

The Tahoe stopped at the stop sign at the Rutan Street and Ross Parkway intersection and signaled that it was turning right (east) to head back on Ross Parkway.  When Officer Fisher came to a stop at the same stop sign moments later, he turned to his right and saw the Tahoe "accelerating and picking up speed above the standard speed limit in the neighborhood."[5]

Officer Fisher "attempted to catch up to it," but the Tahoe "kept picking up more and more speed."  He testified that he was doing "70 miles an hour through a neighborhood," but the Tahoe "was continuing to pull away and get faster."  He estimated that the Tahoe was more than one block ahead of him, traveling "around 75 to 80."  "At one point," according to Officer Fisher, "I was so far behind [the Tahoe], I was turning my lights and siren on, hoping that the siren would warn the neighborhood 'cause a lot of kids to play in the streets out there, even at midnight."

While Officer Fisher was pursuing the Tahoe, Officer Thompson was still on foot.  She was still roughly in the area of Residence 3—just north of Ross Parkway, about halfway between Rutan and Jewett.  After standing in place for a "couple of minutes," she saw the Tahoe drive past her, heading east on Ross Parkway.  She then saw Officer Fisher's patrol car drive by about "three or four seconds" after the Tahoe had passed.  The Tahoe was traveling "at least 70 miles

---

[5] Officer Fisher testified that the standard speed limit unless posted is 30 miles per hour.  Presumably, the speed limit in this particular neighborhood was 30 miles per hour.

an hour" in her opinion.  Because Officer Fisher's patrol vehicle was not equipped with video recording equipment or radar detectors, the officers' testimony regarding the Tahoe's speed was the only evidence presented to the Court.

Despite Officer Fisher's lights and siren, the Tahoe continued eastbound on Ross Parkway until it reached Jewett Street.  The Tahoe turned left onto Jewett, drove to the end of the cul-de-sac, and parked in front of 2628 Jewett Street.[6]

When Officer Fisher arrived, the driver—Michael J. Mitchell, Jr.—had already exited the vehicle, leaving the driver's side door open.  According to Officer Fisher, Mitchell was walking "quickly" towards the residence.  Officer Fisher slid to a stop behind the Tahoe, leaving about 3 feet of clearance between his patrol car and the Tahoe.  Mitchell was directly between the two bumpers.  Officer Fisher got out of his vehicle, and "told him to stop and put his hands on the top of his head."  Mitchell immediately complied.

Officer Fisher then "decided to conduct a pat down to make sure he didn't have any weapons on him."  While Mitchell was wearing a tank top and gym shorts, Officer Fisher still decided to conduct the pat down because he had "been to several trainings where they said it is still easily able to conceal a handgun in your waistband in gym shorts."  So Officer Fisher began "feeling around his waist and in his pockets to make sure he didn't have any knives or anything like that as well."  When Officer Fisher "was feeling down his left front pocket," he "felt a small bulge about the size of a quarter."  Officer Fisher testified that he recognized the bulge "as the way that people sometimes package and carry around personal-use marijuana."

---

[6] The entire pursuit spanned approximately 8 blocks, but ended less than 3 blocks away from where it began.  Officer Fisher began following the Tahoe on Ross Parkway westbound at approximately the intersection of Ross and Roosevelt Street.  Officer Fisher followed the Tahoe for 2 blocks to Rutan Street, at which point the Tahoe turned around and got back on to Ross Parkway eastbound.  From Rutan, the Tahoe drove 4 blocks, passing through the intersections at Leahy Court, Roosevelt Street, and Fee Street before turning left onto Jewett Street.

He stated: "When I rubbed my hand down his pocket and felt that bulge, it felt what I had recognized from my personal experience to be possibly a plastic bag of illegal narcotics, so I immediately went in just for that one item, to confirm my suspicions."  After retrieving the item from Mitchell's pocket, he identified it as "a green botanical substance similar to marijuana." So, according to Fisher, "I placed him in handcuffs at that time, and then conducted a full search of his pockets."

During the search he found a small bag of methamphetamine in Mitchell's other pocket. Officer Fisher then put Mitchell in two sets of handcuffs and placed him in the back of the patrol vehicle.  At some point during the exchange, Mitchell told Officer Fisher he had recently been released from jail for aggravated burglary.  After securing Mitchell in the back of the patrol car, Officer Fisher "began to search [Mitchell's Tahoe] for any other illegal narcotics."  Officer Fisher testified: "When I looked in the center console there was a Glock handgun that was sitting inside the center console."[7]  Officer Fisher also discovered a marijuana pipe on the floor.

After the search, Officer Fisher ran Mitchell's record through law enforcement databases. He discovered that Mitchell was a convicted felon and his driver's license was suspended.  When the Officers booked Mitchell at the county jail, they charged Mitchell with felon in possession of a firearm, the possession of methamphetamine with intent to distribute, possession of marijuana with intent to distribute, possession of stolen property, possession of drug paraphernalia, reckless driving, and driving on a suspended driver's license.

At the hearing, Officer Fisher testified that he believed the Tahoe was driving recklessly while it was heading east on Ross Parkway between Rutan and Jewett.  In his opinion, "there

---

[7] After reviewing photographs taken on the day of the arrest, Officer Fisher clarified that the Glock was resting in the "center console cup holder."

was no way if anybody pulled out of the driveway or out of an intersection and pulled out in front of him, there was no way he would have had enough time to try to stop or do anything to try to avoid a collision."  Officer Fisher also testified that he believed he had probable cause to arrest Mitchell for reckless driving when he made his initial contact with Mitchell.

After cross-examination, the Court asked Officer Fisher some questions.  The Court first asked Officer Fisher how he would have completed the traffic stop if he had not found drugs in Mitchell's pocket during the pat-down.  Officer Fisher answered that he would have verified Mitchell's identity, checked for warrants, and checked Mitchell's driver's license.  He noted that he still would have discovered that Mitchell had a suspended driver's license "so at that time he would have been detained and placed in custody for driving on suspended."  Continuing, he testified that when another Officer showed up, he "would have went up, looked in the vehicle, saw the gun, maybe started questioning him about the gun."

On redirect examination, the Government asked Officer Fisher whether he would have arrested Mitchell for driving recklessly.  Officer Fisher answered:

> [H]e would have come back suspended, and at the time, 'cause we kind of changed our laws about suspended and stuff like that because on my initial contact he was compliant, I probably would have, if it was allowed at the time by our policies, I probably would have given him a court date for the driving on suspended and maybe written him for the reckless and not booked him.

The Government did not follow up with his response; the Defendant had no further questions.

## II.        Discussion

Mitchell argues that Officer Fisher's actions amounted to "indiscriminate police behavior of a SCAT Officer using a speeding offense to justify a much more invasive search that Supreme Court precedent . . . simply does not permit."  Mitchell primarily relies on *Terry v. Ohio* to argue that Officer Fisher violated his Fourth Amendment rights when he felt an item in Mitchell's

pocket, and immediately reached in to pull out the suspected marijuana.  Thus, Mitchell argues, the "fruits" of the illegal search and seizure—including the firearm found in the vehicle, and the statements taken from him at the jail later that same evening—should be suppressed as well.[8]

The Government responds by arguing that Officer Fisher had probable cause to arrest Mitchell for reckless driving—an arrestable offense in the State of Kansas.[9]  Because the officer objectively could have arrested Mitchell for reckless driving, Officer Fisher had the authority to search Mitchell "pursuant to that ability to arrest as soon as he made contact with him."  The Government alternatively argues that Officer Fisher's actions constituted a lawful stop and frisk.

The Court will first address Mitchell's argument that the pat-down was unlawful under *Terry*.  Then the Court will address whether the search was a valid search incident to arrest.

### A. *Terry* Protective Pat-Down

"Time and again" the Supreme Court "has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions."[10]  And the Court has made it clear that the "inestimable right of personal security" embodied in the Fourth Amendment "belongs as much to the citizen on the streets . . . as to the homeowner closeted in his study . . . .  For, as [the Supreme] Court has always recognized, 'No right is held more sacred, or is more carefully guarded, by the common

---

[8] *See Wong Sun v. United States*, 371 U.S. 471 (1963).

[9] *See* K.S.A. § 8-1566(a), (b); K.S.A. § 21-6602(a).

[10] *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quotation marks omitted).

Case 6:16-cr-10112-EFM   Document 23   Filed 02/10/17   Page 9 of 20


law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' "[11]

In *Terry*, the Supreme Court defined one exception to the prohibition against warrantless searches of a person.  The Court "held that during an investigatory stop police officers were entitled to make a limited search for weapons that might be used to harm them when they have a reasonable, articulable suspicion of danger."[12]  In *Sibron v. New York*,[13] the Court stated that the "only goal which might conceivably" justify a search in the context of a *Terry* stop is a search for weapons.[14]

"The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence."[15]  Thus, the fruit of a search that "goes beyond what is necessary to determine if [a] suspect is armed . . . will be suppressed."[16] This is so, the Court explained in *Dickerson*, because searches that exceed what is necessary to determine if an individual is armed "amount[] to the sort of evidentiary search that *Terry* expressly refused to authorize" and the Court "condemned" in subsequent cases.[17]

However, the Court has also held "that police officers, at least under certain circumstances, may seize contraband detected during the lawful execution of a *Terry* search."[18]

---

[11] *Terry*, 392 U.S. at 8–9 (quoting *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

[12] *United States v. Thomson*, 354 F.3d 1197, 1200 (10th Cir. 2003) (citing *Terry*, 392 U.S. at 24).

[13] 392 U.S. 40 (1968).

[14] *Id.* at 65.

[15] *Adams v. Williams*, 407 U.S. 143, 146 (1972).

[16] *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (citing *Sibron*, 392 U.S. at 65–66).

[17] *Id.* at 378 (citing *Michigan v. Long*, 463 U.S. 1032, 1049 n.14 (1983); *Sibron*, 392 U.S. at 65–66).

[18] *Id.* at 374.

For example, in *Long*, the Court held: "If, when conducting a legitimate *Terry* search of the interior of the automobile, the officer should . . . discover contraband other than weapons, he clearly cannot be required to ignore the contraband and the Fourth Amendment does not require its suppression in such circumstances."[19]  The Court in *Long* justified this holding by referencing cases under the "plain-view" doctrine.[20]  "Under that doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."[21]  "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.*, if 'its incriminating character is not immediately apparent'—the plain-view doctrine cannot justify its seizure."[22]

Then, in *Dickerson*, the Court applied the plain-view doctrine by analogy to cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search.  The rationale of the plain-view doctrine is that if contraband is left in the open and is observed by an officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no "search" under the Fourth Amendment.[23]  "The warrantless seizure of contraband that presents itself in this manner is deemed justified by the realization that resort to a neutral magistrate under such circumstances would often be impracticable and would

---

[19] *Long*, 463 U.S. at 1050.

[20] *See id.*

[21] *Dickerson*, 508 U.S. at 375 (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990); *Texas v. Brown*, 460 U.S. 730, 739 (1983) (plurality opinion)).

[22] *Dickerson*, 508 U.S. at 375 (quoting *Horton*, 496 U.S. at 136) (internal quotations and citation omitted).

[23] *Id*. (citing *Illinois v. Andreas*, 463 U.S. 765, 771 (1983)).

do little to promote the objectives of the Fourth Amendment."[24]   Accordingly, the *Dickerson* Court determined that "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context."[25]

Despite making this broad proclamation, the Court ultimately held that the police officer in *Dickerson* "overstepped the bounds of the 'strictly circumscribed' search for weapons allowed under *Terry*."[26]   In reaching this decision, the Court relied on the lower court's examination of the record, which found "that the officer's own testimony 'belies any notion that he immediately' recognized the lump as crack cocaine."   "Rather, the [lower court] concluded, the officer determined that the lump was contraband only after 'squeezing, sliding and otherwise manipulating the contents of the defendant's pocket'—a pocket which the officer already knew contained no weapon."   Furthermore, the Supreme Court added that "the officer's continued exploration of [Dickerson's] pocket after having concluded that it contained no weapon was unrelated to 'the sole justification of the search under *Terry* . . . the protection of the police officer and others nearby.'"[27]

Here, Mitchell argues that pursuant to this well-established body of law, it was unlawful for Officer Fisher to immediately reach into his pocket and retrieve the item he felt because it

---

[24] *Id.*

[25] *Id.* at 375–76.

[26] *Id.* at 378.

[27] *Id.*

was not done for protective purposes, but rather amounted to an impermissible evidentiary search unsupported by probable cause.  In contrast, the Government cites *United States v. Lang*[28] to assert that Officer Fisher's pat-down was lawful.  The Government contends that "Officer Fisher was patting the defendant down for any weapons and when he patted down the defendant's left front pocket he felt what he immediately recognized as a plastic bag of drugs."

Applying the law to the facts of this case, the Court concludes that Officer Fisher overstepped the bounds of the "strictly circumscribed" search for weapons allowed under *Terry*.[29]  Although the officer was lawfully in a position to feel the bag in Mitchell's pocket,[30] because *Terry* entitled Officer Fisher to place his hands over Mitchell's pocket, "the incriminating character of the object was not immediately apparent to him."[31]  When Officer Fisher "was feeling down [Mitchell's] left front pocket," he "felt a small bulge about the size of a quarter."  Officer Fisher testified that he recognized the bulge "as the way that people sometimes package and carry around personal-use marijuana."  He further stated: "When I rubbed my hand down his pocket and felt that bulge, it felt what I had recognized from my personal experience to

---

[28] 81 F.3d 955 (10th Cir. 1996).

[29] *See Terry*, 392 U.S. at 26.

[30] In his filing with the Court, Mitchell appears to argue that Officer Fisher lacked reasonable suspicion to perform a *Terry* stop and frisk.  He writes:
> Even Officer Fisher and his partner that evening, Officer Thompson, who had been investigating a black male suspect at a different residence elsewhere in the neighborhood, could not have believed Mr. Mitchell, a white male, as being involved in illegal activity but for the speeding.  That's all Officer Fisher had at this time.  There was nothing but the unsubstantiated suspicion or hunch by this SCAT officer that this speeder may have been involved in criminal conduct.

The Court disagrees.  The Officers had observed a Tahoe at a suspected drug house earlier that evening.  Shortly after Officer Fisher began following the Tahoe Mitchell was driving, Mitchell turned his vehicle around and began speeding back in the direction he came from, presumably to the safety of his own residence.  When Mitchell parked, Officer Fisher observed him walking quickly towards a residence.  These facts are sufficient to provide reasonable suspicion to perform a *Terry* stop and frisk.

[31] *Dickerson*, 508 U.S. at 379.

be possibly a plastic bag of illegal narcotics, so I immediately went in just for that one item, to confirm my suspicions."

As in *Dickerson*, the incriminating character of the bag was not immediately apparent to Officer Fisher, and he lacked probable cause to immediately reach into Mitchell's pocket and seize the bag.[32]   Officer Fisher's pat-down of Mitchell's pocket revealed only a "small bulge about the size of a quarter."   There is no evidence to suggest that Officer Fisher believed the bulge was any type of weapon.   At that point, Officer Fisher's search may have reached the bounds marked by *Terry*, which allows a protective search "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby."[33]   Yet Officer Fisher "immediately went in" to Mitchell's pocket to confirm his "suspicions."   His testimony belies any notion that he immediately recognized the bulge as illegal contraband.   At best, Officer Fisher had his "*suspicions*" that the bulge was "*possibly* a plastic bag of illegal narcotics," the way marijuana is "*sometimes*" packaged.   Officer Fisher's suspicions did not rise to the level of probable cause necessary to justify the invasive search he performed.

Furthermore, the Court is not persuaded by the Government's argument that the search was lawful under *Lang*.   In *Lang*, two police officers performed a traffic stop and directed the two occupants to exit the vehicle.[34]   After the suspects complied, the officers performed a "standard pat down search for weapons" on each of the occupants.[35]   The driver had no weapons

---

[32] *See United States v. Castorena-Jaime*, 285 F.3d 916, 924 (10th Cir. 2002) ("An item's incriminating nature is immediately apparent if the officer had probable cause to believe the object was contraband or evidence of a crime.").

[33] *Terry*, 392 U.S. at 26.

[34] *Lang*, 81 F.3d at 960.

[35] *Id.*

or other contraband on his person, but a pat-down of the passenger "revealed a suspicious bulge protruding from the suspect's left front pants pocket."[36]   The officer asked the man what was in his pants pocket, and the passenger replied, "money."   Then the officer "asked the man's permission to examine the 'money' and received consent."[37]   After asking again, and receiving consent again, the officer removed the rolled-up plastic bag and discovered what appeared to be cocaine inside.[38]

On appeal, the defendant argued that once the officer concluded the bulge in his left front pants pocket was not a weapon he should have stopped the search.   The Tenth Circuit rejected this argument, writing: "[u]nder *Dickerson*, [the officer's] discovery of the plastic bag of cocaine in [Lang's] pocket was reasonable because there is no evidence he did anything more intrusive than a simple pat down search."[39]

"However," the court continued, "in this case, the search does not stand or fall based on *Dickerson* because Officer Mumma twice asked for and received [Lang's] consent to search his pocket."[40]   As such, the court's opinion that the search was reasonable under *Dickerson* was merely dictum.   Regardless, the facts of this case are distinguishable.   In *Lang*, the pat-down search revealed a "suspicious bulge" protruding from the defendant's front pocket.[41]   At that

---

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.* at 967.  Unfortunately, this is the full extent of the court's analysis of *Dickerson* as applied to the facts of the case before it.

[40] *Id.*

[41] This is the full extent of the facts present in the *Lang* opinion regarding the nature of the object in the defendant's pockets.  The court did not provide any facts regarding the officer's subjective belief of what he thought the object was.

point, the officer stopped, asked the defendant what was in his pocket, and asked the defendant twice if he could remove it from his pocket before proceeding to do so. Here, Officer Fisher "felt a small bulge about the size of a quarter" in Mitchell's front pocket. Instead of pausing to ask Mitchell what was in his pocket, or asking for permission to retrieve the item, Officer Fisher "immediately" reached in to seize the bag. As discussed above, this was done without probable cause. Thus, *Lang* does not control the Court's analysis.

Accordingly, for the reasons stated above, the seizure of the contents of Mitchell's pocket was not justified under *Terry* and *Dickerson*.

## B. Search Incident to Arrest

While the search was unlawful under the *Terry* and *Dickerson* framework, the authority for warrantless searches incident to arrest is much greater than that permitted by *Terry*. Police making a lawful arrest may search the arrestee's person and the space within his immediate control, meaning the area from which he might gain possession of a weapon or destructible evidence.[42] The search incident to arrest exception to the Fourth Amendment warrant requirement serves two purposes: "to discover hidden weapons and to prevent the suspect from destroying evidence."[43] Unlike a *Terry* frisk for weapons, a search incident to arrest can "involve a relatively extensive exploration of the person."[44] Accordingly, while conducting a

---

[42] *Arizona v. Gant*, 556 U.S. 332, 338 (2009).

[43] *United States v. Edwards*, 632 F.3d 633, 643 (10th Cir. 2001) (citing *Chimel v. California*, 395 U.S. 752, 762 (1969)).

[44] *United States v. Robinson*, 414 U.S. 218, 227 (1973).

search incident to arrest officers are not limited to a search for weapons, but can also search for evidence of other crimes.[45]

1.  *Officer Fisher had Probable Cause to Believe that Mitchell had Committed a Misdemeanor*

The validity of a search incident to arrest depends on the lawfulness of the arrest, which in turn requires probable cause to believe that a crime has been committed.[46]  Mitchell argues that Officer Fisher did not have probable cause to believe he violated the Kansas statute for reckless driving.  Instead, he contends that he was simply speeding—a mere traffic offense.  This argument is readily dismissed.  K.S.A. § 1566 makes reckless driving a criminal misdemeanor, it provides that "[a]ny person who drives any vehicle in willful or wanton disregard for the safety of persons or property is guilty of reckless driving."  The statute subjects violators to "not less than five days nor more than 90 days imprisonment . . . ."[47]

There is a dearth of case law interpreting the statute, but the facts presented at the motion to suppress hearing are similar to a case decided by the Kansas Court of Appeals.  In *State v. Kapaun*,[48] the Kansas Court of Appeals upheld a reckless driving conviction when a motorcyclist was observed by law enforcement traveling at 90 to 100 miles per hour on the interstate, failed to stop at a red traffic light, made a right turn without signaling, was observed rapidly accelerating onto a residential street, and continued to flee after the pursuing highway patrol trooper activated his emergency lights and siren.[49]

---

[45] *United States v. McKissick*, 204 F.3d 1282, 1296 (10th Cir. 2000).

[46] *See United States v. Sanchez*, 555 F.3d 910, 920 (10th Cir. 2009).

[47] K.S.A. § 8-1566(b).

[48] 2006 WL 3231398 (Kan. Ct. App. Nov. 3, 2006).

[49] *Id.* at *1–2.

Similarly, in this case the officers' testimony established that Mitchell was driving over 70 miles per hour on a residential street, he was observed rapidly accelerating onto a residential street, and continued to flee after the officer activated his emergency lights and siren. He was going so fast that Officer Fisher observed the Tahoe leaning sharply to the side when the road curved. While Mitchell did not commit as many traffic violations as were present in *Kapaun*, the defendant in that case was tried and convicted of the offense. Officer Fisher merely needed probable cause to believe Mitchell was driving "in willful or wanton disregard for the safety of persons or property." The Officers' testimony established that Mitchell was driving in a residential neighborhood, where children were known to play, at such a high rate of speed that he would not have been able to avoid a collision if a car would have pulled out from a driveway or a cross street. Mitchell's misconduct was therefore more than sufficient to establish probable cause to believe he was driving recklessly in violation of K.S.A. § 1566.

   2. *Officer Fisher's Search Did Not Exceed the Permissible Scope of a Search Incident to an Arrest for Reckless Driving*

Having concluded that Officer Fisher had probable cause to arrest Mitchell at the time of their encounter, the Court will now scrutinize both the search of Mitchell's pockets, and the subsequent search of Mitchell's vehicle.

First, the Court concludes that Officer Fisher's search of Mitchell's pockets was permissible. "The Supreme Court has long held that 'in the case of a lawful custodial arrest a *full search of the person* is not only an exception to the warrant requirement of the Fourth Amendment, but is also a reasonable search under that Amendment.' "[50] Additionally, the

---

[50] *United States v. Lasley*, 412 F. App'x 177, 180 (10th Cir. 2011) (quoting *Robinson*, 414 U.S. at 235) (emphasis in original).

permissible scope of a search incident to arrest is not necessarily defined by the existence or absence of evidence of the particular crime for which the arrest is made.[51]   Officer Fisher therefore had the authority to conduct a full search of Mitchell's person—including his pockets[52]—despite the impossibility of finding evidence of the crime of reckless driving on Mitchell's person.[53]

The fact that Officer Fisher's objective intention was to perform a protective pat-down, not a search incident to arrest, is of no legal consequence.   In the Tenth Circuit, a warrantless search preceding an arrest is still "a legitimate search incident to arrest as long as (1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed shortly after the search."[54]   Here, as discussed above, a legitimate basis for the arrest (reckless driving) existed before the search, and Officer Fisher formally arrested Mitchell almost immediately after conducting the search.   Therefore, both of the *McKissick* prongs are satisfied, rendering Officer Fisher's search of Mitchell's pockets a legitimate search incident to arrest.

Second, the search of Mitchell's Tahoe was also permissible.   In *Arizona v. Gant*,[55] the Supreme Court held that police are authorized to search a vehicle incident to a recent occupant's arrest in two instances: (1) when the arrestee is unsecured and within reaching distance of the

---

[51] *Id.* (citing *Robinson*, 414 U.S. at 234).

[52] *See Robinson*, 414 U.S. at 226 (quoting *Chimel*, 395 U.S. at 762–763) (" 'When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape.   Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated.   In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.' ").

[53] *See id.* at 234 ("The standards traditionally governing a search incident to lawful arrest are not . . . commuted to the stricter *Terry* standards by the absence of probable fruits or further evidence of the particular crime for which the arrest is made.").

[54] *McKissick*, 204 F.3d at 1296 (quoting *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998)).

[55] 556 U.S. 332 (2009).

-18-

passenger compartment at the time of the search; and (2) "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' "[56]

Here, the first justification—officer safety—is not applicable because Mitchell was handcuffed and secured in the back of the patrol vehicle at the time of the search. However, Officer Fisher had reason to believe evidence relevant to the crime of arrest might be found in the vehicle. As noted above, the search incident to arrest was justified on the basis of probable cause to arrest Mitchell for reckless driving. While conducting the search incident to arrest, Officer Fisher discovered synthetic marijuana and methamphetamine, at which point Mitchell was arrested for both reckless driving and possession of a controlled substance. Clearly, Officer Fisher had no reason to believe he would find evidence of reckless driving in Mitchell's vehicle, but it was reasonable to believe evidence relevant to the possession of a controlled substance crime might be found in the vehicle.[57] Thus, Officer Fisher had "a basis for searching the passenger compartment of [Mitchell's] vehicle and any containers therein."[58]

Accordingly, both the search of Mitchell's pockets, and the subsequent search of Mitchell's vehicle were valid under the search incident to arrest doctrine.

---

[56] *Id.* at 343 (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in judgment)).

[57] *See, e.g.*, *United States v. Davis*, 569 F.3d 813, 816–18 (8th Cir. 2009) (concluding the law enforcement officer's warrantless search of the defendant's vehicle fell within the search incident to arrest exception where, at the time of the search, the officer had already discovered marijuana in the defendant's pocket and placed defendant in custody).

In this case, the Government argued in a conclusory manner that "it was reasonable for Officer Fisher to believe there may be additional drugs in the defendant's automobile after he found him in possession of both suspected marijuana and methamphetamine." Mitchell did not address this argument at the hearing or in his brief that it was unreasonable to believe evidence relevant to the crime of arrest (possession of a controlled substance) would be found in the vehicle. As Mitchell apparently concedes this issue, and there was no evidence indicating otherwise, the Court finds that Officer Fisher had reason to believe he would find additional evidence relevant to the crime in the vehicle.

[58] *Gant*, 556 U.S. at 344.

### III.     Conclusion

In sum, the Court concludes that Officer Fisher's search of the inside of Mitchell's pocket was not justified under *Terry* and *Dickerson*.  However, even though Officer Fisher believed he was performing a protective pat-down, he objectively had probable cause to arrest Mitchell for reckless driving.  Thus, his search of Mitchell's pockets was justified as a valid search incident to arrest.  Furthermore, the search of Mitchell's vehicle for additional evidence of drug possession was justified under *Gant*.

**IT IS THEREFORE ORDERED** that Mitchell's Motion to Suppress (Doc. 15) is hereby **DENIED.**

**IT IS SO ORDERED.**

Dated this 10th day of February, 2017.

*Eric F Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE